Statement of the Case.
MONROE, J.
On February 23, 1906, Mrs. (Widow) L. P. Patout and L. J. Burguieres, individually and on behalf of the firm of Patout & Burguieres, of which they constituted the membership, executed a notarial act of mortgage and pledge upon their interest in Vacherie plantation, in the parish of St. Mary, to secure the payment of a note for $50,000 made by them, of even date with the act, identified therewith, payable to their order on February 1, 1907, and by them indorsed in blank, which note was given as representing the indebtedness of the makers for money loaned to them, at the time, by the firm of A. Adler & Co., of this city, for ■the making of the sugar crop of 1906-07 upon the plantation mentioned. On March 19, 1908, the Seaboard National Bank, of New York, appearing as the holder and owner of the note so described (subject to a credit of $5,000), obtained an order for the seizure and sale of the mortgaged property for the payment of the same, and, pending the delay required for notice to defendants, there was some correspondence between the sheriff and the counsel for the plaintiff, and between the counsel and their client, upon the subject of the advances that would be required to operate the plantation. On March 20th the sheriff wrote to the counsel:
“Will you kindly advise whether you will make arrangements for the money necessary for same [for the sheriff to take charge of, and run, said plantation] or will you expect the sheriff to do so? I ask this in advance so as to prevent any discord among the laborers or damage to the crop, by allowing the place to remain idle during the time said place is under seizure. * * * ”
The counsel, having communicated with their client, received a telegram reading as follows:
“Seaboard will not pay operating expenses. Suggest you give opportunity to owners and other lienors and State National Bank, which is interested, to operate plantation, if they desire, pending our possession. Have written.”
A letter confirming the telegram having been received, counsel, on March 23d, wrote to the sheriff that the plaintiff in the writ would not assume the expense of operating the plantation, and on the following day the sheriff answered (quoting in part):
“Replying to your favor of the 23d, in reference to the operation of the Vacherie plantation — against which you have issued execution for the Seaboard Nat. Bank, and which will be seized to-morrow, under the writ of seizure— beg to say that I have always understood the law imposed upon me the duty and obligation of administering and caring for whatever property I might seize under final process. Our custom, out here in the country, when a sheriff is required to seize a plantation upon which there is a growing crop, has always been to take possession and cultivate the crop. In fact, as I read article 657, Code Prac., it makes it the duty of the sheriff to do this. You will readily appreciate that, if a sugar plantation, upon which has been planted a crop of sugar cane, was to remain uncultivated for the five or six weeks that the property was in the hands of the sheriff, the crop would become worthless, as it would grow up in weeds; and, on this particular plantation, it might become entirely lost, because the lands are almost all reclaimed lands and every heavy rain requires that it be drained by the three draining machines on the plantation.”
The sheriff then quotes his attorney, to the effect that:
“The law makes it the duty of the sheriff, whenever he has seized a plantation, to appoint an overseer to manage the plantation and to cultivate it. He would be responsible for damages resulting to the creditors for permitting the plantation to remain idle,”
—and, upon the same authority, cites in support of that view Lockhart v. Morey, 41 La. Ann. 1165, 4 South. 581, Learned v. Walton, 42 La. Ann. 455, 7 South. 723, and Am. Nat. Bank v. Childs, 49 La. Ann. 1359, 22 South. 384. He then continues:
“The costs, such as you mention in your letter [cost of making the seizure, advertising the sale, and a keeper; in other words, the actual sheriff fees], under our custom here, are never *1063 paid until the sale. The custom in the country is to pay off the labor on the plantation every two weeks, and this money will have to be advanced for that purpose.”
The counsel wrote again to their client, and again received the suggestion that they had better give other parties in interest an opportunity to make the advances, but that it (the Seaboard) would not do so. Counsel thereupon (on April 1st) addressed a circular letter to the owners of the plantation, to a party who held a contractor’s lien on the sugar house and one acre of ground, and to the State National Bank, informing them of the situation, and submitting to them the question, what should be done about making the advances needed by the sheriff. The owners and the holder of the contractor’s lien paid no attention to the letter. The liquidators of the State National Bank were more concerned, but did not see their way to immediate action; the facts in that connection being that, prior to going into liquidation (in December, 1907), the State National Bank, in the course of its business relations with the Seaboard National Bank, had pledged to the latter the $50,000 note in question, with other paper, as collateral security, and was bound to make the Seaboard whole with respect thereto, and negotiations for the settlement of the account between the bank and the liquidators were then pending. As a result of those negotiations, the liquidators reacquired the note in question shortly before the 9th of May, when the property seized for its payment was to be sold, and they engaged the services of the counsel who had represented the Seaboard to continue in charge as their representatives, requesting them to obtain a postponement of the sale, or, in the alternative, to bid on the property at the offering by the sheriff. On May 7th therefore the counsel telegraphed the sheriff to postpone the sale; but the sheriff, who had, in the meanwhile, been operating the plantation, in part apparently upon credit, and in part with borrowed money, sent a reply telegram upon the subject of his advances, to which on May 8th the counsel answered :
“Referring to your telegram of even date, this is to advise that the liquidators of the State National Bank will honor your draft for account costs, in accordance with your telegram.”
And the liquidators wrote a letter, on the same day, to the same effect. Even then, however, the sheriff was not satisfied, and, one of the counsel having gone to Franklin (the parish seat), on May 8th was given to understand that the sale would not be postponed unless a more satisfactory arrangement should be made. He, therefore, telephoned to the liquidators and received an answer, on the following morning (May 9th), advising him that the liquidators had deposited, in a bank in New Orleans, to the credit of one of the banks in Franklin, the amount called for by the sheriff (say $7,203.-51), to cover the expense of his administration of the seized property up to that time, that the sheriff could draw on the Franklin Bank for that amount, and that he could draw on the liquidators for expenses to be thereafter incurred in the same behalf. And the sale was thereupon postponed.
The counsel then addressed a letter to the sheriff in which they said:
“In the matter of the Seaboard National Bank v. Patout & Burguieres, wherein we issued a writ of’ seizure and sale, and in which the sale advertised for to-day was postponed, we ask you to maintain the writ and seizure in all respects, for we wish to release, relinquish or forego no right whatsoever that we have acquired by the writ of seizure.”
And the sheriff then signed a letter addressed to the counsel, and prepared by one of them, reading:
“In conformity to your request of this morning, beg to say that the amount paid as costs incurred up to the 9th of May, 1908, in the matter of the Seaboard National Bank v. Patout & Burguieres, as well as any other moneys advanced in this matter for the running of the said plantation, will be considered as *1065 costs and will be paid first and above all other claims. The property will remain under seizure, under the writ, until a financial disposition of the writ has been had, and this writ will remain in force until ordered returned to the court by virtue of a settlement of said writ either by sale or otherwise.”
The property was then advertised, to be sold on July 11th but before that day was reached, the note again changed hands, having been acquired by Emile Gaja-n and certain other persons under an instrument in writing, in which it was stipulated and agreed, in substance as follows:
That, in consideration of the transfer of the note to them, by the “holder,” represented by Mgrrick & Lewis, attorneys, they agreed to pay, and did pay, $15,000, by certified check, and $15,000, by a note for that amount, payable in 60 days and secured by pledge of the note purchased; the instrument also containing the following:
“It is further agreed that any money in the hands of the sheriff of St. Mary, La., as a result of the sale under foreclosure in the matter of the Seaboard National Bank v. Patout & Burguieres, to take place on Saturday, July 11, 1908, after paying all necessary legal costs of suit and expenses in the running of the plantation since seizure, and legal sheriffs and other costs, shall be turned over for the purpose of reducing the indebtedness on the above-mentioned note for $15,000. It is finally agreed, as a further consideration for the transfer and assignment of the said $50,000 mortgage note, that should any money be realized by reason of the defeating of any proceedings or action, already instituted or to be hereafter instituted, in the matter of the Seaboard National Bank v. Patout & Burguieres, No. 12,202; parish of St. Mary, La., Twenty-Third judicial district court, any and all money thus saved or realized by the purchasers shall, up to the sum of $2,500, be paid to the transferrers and assignors of the said $50,000 mortgage note.”
The property was nevertheless offered, as advertised, on Saturday, July 11th, and, the sale having been continued until Monday, July 13th, was, on that day, adjudicated, for $130,600 to A. D-. Kemper, agent. It was, however, considered, in’ looking into the matter, that the amount .bid was insufficient to pay the debts secured by mortgages and privileges, which primed that of the seizing creditor, and the sheriff, therefore, declared that there “was no adjudication,” in a communication addressed to the adjudieatee, from which we make the following excerpt:
“The seizing creditor, represented by Messrs. Burke & Burke and Merrick & Lewis, attorneys, has demanded that the amount of the bid must exceed the mortgage and privilege indebtedness, bearing upon and affecting said property, which outrank the mortgage of the seizing creditor, plus the costs of this proceeding, which amount to $14,065.83; and, as the bid of A. D. Kemper, agent, is not sufficient to cover the amounts due the mortgage and privilege creditors, outranking the mortgage of seizing creditors,_ plus the costs of this proceeding, the sheriff declares that there was no adjudication of said property, and that I refuse to make a deed thereto. The defendants in execution, through their attorney, Mr. Borah, have demanded that the sheriff dcelare that there has been no adjudication of said property, for the reasons above set forth, and I refuse to make deed to said property, for said reasons.”
A. D. Kemper acted as the agent of W. J. Gajan and other persons associated with him, and it thus appears that they and their attorneys concurred in the view that the $14,065.83 mentioned in the letter of the sheriff, which included the $12,406.32, here claimed by the liquidators,, and, but for which the sale would have been good, represented a privileged claim, priming that of the seizing creditor.
Just here, it is proper to say that, though the sheriff had, at the time of the postponement of the sale, in May, been reimbursed his outlay and furnished with the money to pay the expense otherwise incurred in administering the seized property, and had thereafter drawn on the liquidators of the State National Bank for such expense, he had not been specifically informed that the liquidators had acquired control of the note sued on, and had become the real and only parties in interest in the prosecution of the pending suit, and his chief deputy, who had acted for him in the matter, in tie absence of information to the contrary, was under the impression that the counsel who had originally represented the Seaboard National Bank, as *1067 plaintiff in the writ, continued, to represent it. He was, however, informed, about the time of the failure of the attempt to sell the property, on July 11th, that the writ was under the control of Gajan et al., and was advised by their attorneys that it was abandoned by them; and, in the same connection, he was also informed that the matter of the costs, which had been incurred up to that time, was one in which the liquidators of the State National Bank were alone interested, and which they alone controlled. Thus, on July 15th, the counsel representing the liquidators (and who had originally represented the Seaboard) wrote to the sheriff:
“Testerday, we wired you as follows: ‘As representing the parties who advanced costs for Vaclierie plantation since its seizure by the Seaboard National Bank, we insist that you demand that sufficient funds to meet those costs be placed with you by the purchaser and held by you/ apd we now beg to confirm that message. The reason why we sent the message is because we had heard that you were of the impression that parties represented by Messrs. Burke & Burke [meaning Gajan et al.] had a right to waive those costs. * * * When we informed your office that parties represented by Burke & Burke were the ones to whom you should look for instructions with respect to the writ, nothing was said about the costs and nothing was intended concerning the costs, for the reason that the costs were advanced by persons other than the plaintiff in the action. We chanced to represent all parties in the matter, and, on behalf of those who advanced the costs, and on whom yowr drafts were dratvn, we must ask that you demand that those costs be protected in your hands,” etc. (Italics by the court.)
Gajan et al. having abandoned the pending writ, the plantations reverted to the possession of Patout & Burguieres; but, it being necessary to provide for the cultivation of the growing crop, they (Gajan et al.), as holders of the $50,000 note, entered into a written stipulation, which was duly recorded, as follows:
“We hereby agree, in the event of foreclosing on said note, before the harvesting and shipment of the crop raised on said plantation, to cause the sheriff to offer the property in question subject to, and under, an assumption by purchaser of the contract made by Patout & Burguieres for advances and supplies for the making and harvesting of the crop on said plantation.”
And with some other similar waivers, Pat-out & Burguieres obtained advances and made the crop, and the advances so obtained were subsequently reimbursed from the proceeds of the sales of the crop.
In the month of September, Gajan and his associates caused another writ of seizure and sale to issue, under which the plantation was again seized and advertised to be sold on October 17th following.
On October 13th the liquidators of the State National Bank filed an intervention, alleging the advances made by them, as herein-before stated; that the same were necessary, and were used for the preservation of the plantation and the making of the crop; that they had acquired a lien on the crop therefor; and praying for judgment against Patout & Burguieres, and the members of that firm with recognition of said lien, also ■praying that the crop be appraised and sold separately, and that the sheriff be ordered to hold the proceeds. The court made an order that the crop be separately appraised, and that the sheriff retain a sufficient proportion of the proceeds to protect the claim so set up, and the order was complied with; the amount here in controversy being now in the sheriff’s hands.
At some time prior to the day fixed for the sale, a number of persons, including Gajan, the defendant, Mrs. Patout, and her brother, J. Paul Subervielle, entered into an agreement to bid upon the seized property, when it should be offered by the sheriff, and thereafter, in the event of its being adjudicated to Preston King, whom they selected to represent them, to form two corporations; the one, to take the sugar factory, with the ground upon which it stands, rights, ways, and appurtenances, etc., and the other, to take the balance. King, as the agent of the *1069 parties, accordingly made a bid of $142,000, and the entire property was adjudicated to him, at that price, and he transferred it to L. P. Patout Company, Limited, which was organized for the purpose of taking the title; and L. P. Patout Company, Limited, transferred the sugar factory, etc., to the Mutual Sugar Company, which was organized for the purpose of taking title thereto. At the time of the sale by the sheriff there appeared recorded against the property the following claims, priming the mortgage under which the sale was made, to wit: Louis Levy, $21,-477.03, Minors Patout, $34,471.75, with interest amounting to $10,473.18; Payne & Joubert, $56,199.75; Bank of Baldwin, $1,619.70; A. Hansen Lumber Company, $6,193.66; costs advanced by seizing creditor $14,065.83.
Louis Levy intervened, on the day of the sale, claiming a vendor’s lien, as securing three notes of $5,000 each, with interest, etc., subject to credits aggregating $3,955.47.
The liquidators of the State National Bank, as we have stated, had intervened on October 13, 1908, prior to the sale.
Gajan et al. (the parties who owned the note for the payment of which the property had been sold) filed an answer to the intervention of the liquidators on April 17, 1909, and alleged that the plantation had been seized by the Seaboard National Bank; that the sheriff had demanded an advance of the costs necessary to maintain the seizure, and that the costs had been advanced by the said bank; that the sale, advertised for May 9th, was postponed by order of the plaintiff in the writ; that the costs necessary to maintain the seizure were thereafter advanced by said plaintiff; that by direction of said plaintiff the sale was readvertised for July 11th, and plaintiff continued to advance the costs; that subsequently said bank, having sold the note sued on, abandoned the writ and the seizure made thereunder, and hence that it alone was responsible for the costs thereby incurred; that neither the sheriff nor the defendants arranged with the liquidators of the State National Bank that said liquidators should advance any costs; that, so far as the record discloses, the proceedings were for the benefit of the Seaboard National Bank; that said liquidators are not entitled to reimbursement of costs advanced by that bank; that the moneys advanced for costs cannot give rise to the asserted privilege on the crop when the writ under which the seizure was made was voluntarily abandoned; that they purchased the note sued on from the Seaboard National Bank, and caused the issuance of the writ under which the property was sold to Preston King for $142,-000; that the mortgages and privileges priming that of respondents amounted to $119,-220; that, out of the proceeds'of the sale—
“the sheriff having deducted his costs and discharged the prior liens, privileges, and mortgages,” “there was left, to be applied upon respondents’ writ, the sum of $17,000, and that these respondents * * * remained ordinary creditors of Patout & Burguieres for the sum of $38,570; that when they purchased said note from the Seaboard National Bank, there was in said act of purchase no reservation by the Seaboard National Bank of any of the coste which it had incurred in the prosecution of its writ; and the said bank has not, up to this time, ever pretended that it was entitled to be reimbursed the costs advanced, when it had voluntarily abandoned the proceedings in which said costs had been incurred.”
On the same day (April 17, 1909), Patout '& Burguieres also filed an answer to the intervention of the liquidators, in which they adopt the answer filed by Gajan et al. For further answer they allege that they were deprived of the use of their property during the seizure, which was made and abandoned by the Seaboard National Bank, and they reserve the right to sue for damages thereby sustained.
On January 25, 1910, the sheriff filed a third opposition, alleging (inter alia) that, having seized the plantation, he made an effort to secure funds required—
“for the preservation of the plantation and the crop thereon, and did secure said funds from the liquidators of the State National Bank; *1071 * * * that, in addition to the * * * sum drawn from the liquidators, * * * aggregating $12,406.36, the said * * * sheriff did incur * * ® an expenditure of $1,054.10; * * * that said expenses were necessary, * * * and that * * * opponent has a lien and privilege on all the crop; * * * that said crop was separately appraised at the sum of $15,000, and said sum was, under order of court, held separate and apart, to respond, as may be directed by the court, to the costs advanced for said plantation while under seizure and claimed herein by * * * the liquidators of the State National Bank and your * * * opponent,” etc.
On March 24,1910, Gajan et al. filed a supplemental answer, in which they alleged that, after the abandonment of the seizure by the Seaboard National Bank, Patout & Burguieres proceeded with the cultivation of the growing crop, and for that purpose borrowed money from the Louisiana Sugar Company, whose privilege for the money .so advanced could not be defeated by any attempt on the part of the liquidators of the State National Bank to have the crop separately appraised, and they pray, in the alternative, and if the liquidators be held entitled to a privilege, that such privilege be subordinated to that of the Louisiana Sugar Company.
On April 15, 1910, L. P. Patout Company, Limited, filed a third opposition, in which it alleged that it owned the note for $50,000, for the payment of which the plantation was sold:
“That, while the * * * plantation was under seizure * * * in the suit of Emile Gajan v. Patout & Burguieres, J. Paul Subervielle, now the president .of * * * third opponent company, contemplating the purchase of said plantation, entered into an agreement with ■ * a: * the then holders of said note, by which he would purchase said note for a company, to be organized by him, in the event it became the purchaser of the * * * plantation.”
It then alleges the adjudication of the plantation to King and its transfer by him, and—
“that it thereafter acquired said note, in accordance with the arrangements theretofore made by the said * * * Subervielle, and has since been the bona fide owner of said note, and, the same being secured by special mortgage on the * * * plantation, is entitled therefore to the proceeds resulting from the sale thereof, in preference over all other creditors, and especially in preference over the pretended claim of the liquidators of the State National Bank; * * * that the amount they are now claiming is the amount paid by the Seaboard National Bank * * * as costs, under the writ that it afterwards abandoned, * * * and the liquidators * * * had no privilege on the crop * * * and was without any right to any separate appraisement of said crop; * * * that when the said * * * plantation was sold, it was acquired by the agent of your petitioner, Preston King, for the price and sum of $142,000; that the mortgages and privileges ranking that of the seizing creditor, Emile Gajan, aggregated upwards of $123,-000, leaving your petitioner, by reason of its purchase of said note, an ordinary creditor of Patout & Burguieres for upwards of $38,-000; that the entire plantation and the crop .being covered by the mortgage of your petitioner, it is entitled to the proceeds now in the hands of the said sheriff, without which it will have received no credit on its said note.”
It is shown, without attempt at contradiction, that on July 11th, when the plantation was adjudicated to Kemper, agent, the counsel representing the sheriff discussed, with the counsel representing the parties for whom Kemper was acting, as also those representing the plaintiffs and defendants in the writ, the question whether there was a sale or no sale; that the discussion was based upon a statement showing that, the amount bid being $130,600, the mortgages and privileges, exclusive of that of the sheriff for the $14,065.83. claimed by him, which primed the mortgage of the seizing creditor, aggregated $130,339.07, and hence that there was a sale, unless the amount so excluded should be included; and that it was agreed by all parties, after some resistance by one of those for whom Kemper was acting, that the amount due the sheriff should be included among those entitled to ranking privileges, whereupon the sheriff notified Kemper that there was no sale. It is also shown, without attempt at contradiction, that when the plantation was offered for sale under the writ issued at the instance of Gajan et al., counsel representing the parties who had determined to *1073 make a bid applied to the counsel for the sheriff for information as to the amount that would be required to cover, or exceed, the ranking mortgages and privileges; that a tabulation of the figures was exhibited to the applicant, showing that the amount would have to exceed $141,463; that the first item was one showing that there was due the liquidators of the State National Bank $12,436.56; and that thereafter Preston King, acting as agent, made a bid of $142,000 and became the adjudicatee of the property.
Notwithstanding that the sheriff knew that Gajan et al. had taken the place of the Seaboard National Bank, as the real parties in' interest when the property was offered for sale on July 11th, and notwithstanding that he had been informed, certainly by the letter of their attorneys of July 15th, that the liquidators of the State National Bank had made the advances which he had required, he remained under the impression that those advances were made by, or for account of, the original plaintiff in the seizure, the Seaboard National Bank, and his return, made in February, 1909, contains statements to that effect. On the trial of the case the liquidators offered to prove, item by item, the ¿mounts advanced by them and the purposes for which they were used, but were met by the objection, on the part of counsel representing the appellant now before the court:
“We object to this line of examination because there is no question at issue here involving the correctness of the expenditures made while the property was under seizure.”
The judge of the district court decided the case in favor of the liquidators of the State National Bank, and L. P. Patout Co., Limited, has alone appealed.
Opinion.
[1,2] We find it unnecessary to decide whether the appellant, L. P. Patout Company, Limited, acquired or did not acquire the note for $50,000, or the interest therein, as alleged by it, since the pleadings in the case and the evidence adduced alike place it beyond reasonable dispute that, in any event, its acquisition did not take place until after the foreclosure of the mortgage by which the note was secured, and after the proceeds of the sale of the mortgaged property, in so far as they were available for that purpose, had inured and had been applied to the part payment of the note in the hands of Gajan et al., the then owners, and what was then acquired was merely a claim against the makers personally for the unpaid balance which might then have been due upon the note: and no interest whatever in the proceeds of the sale of the mortgaged property was included in the acquisition, or was, at that time, pretended to have been included by any of the parties to the transaction. Thus, after the plantation had been adjudicated to Preston King, as the agent of the parties who were thereafter to form a corporation, or corporations, and take over the title, there was a meeting, from the minutes of which we make the following excerpt:
“Meeting of the stockholders and board of directors of the L. P. Patout Go., Ltd.; present J. P. SubervieUe and Emile Gajan, representing the entire issue of stock of the L. P. Patout Go., Ltd.. A. J. SubervieUe, secty. & treas. and Emile Gajan, vice president.
“There came before the stockholders and directors, for consideration, the purchase of the Vacherie plantation, adjudicated this day, by the sheriff, * * * to Preston King * * * the purchase price thereof being $142,000, to be paid for by the corporation as f'oUows.”
Then follows the recital of a motion authorizing J. P. SubervieUe, the president, to purchase the plantation for $142,000, upon certain terms as set forth; and the minutes conclude as follows:
“The motion, being duly put, was carried unanimously. There being no further business, the meeting adjourned.”
President SubervieUe testified that the books of the corporation were regularly kept, and showed all of its transactions, that the *1075 “bills receivable” account did not show the purchase of the note for $50,000, and that such a transaction should appear in that account. The note in question was produced in court, and bears upon its back the following inscription, placed there by the clerk of court, as, ex officio, recorder of mortgages, to wit: “Canceled in full” — and the entry on the mortgage records reads:
“The note for $50,000, dated February 1, 1907, identified with and secured by this mortgage, having been presented to me, fully paid and satisfied, this mortgage is therefore canceled and erased, this 14th day of December, 1908.
“[Signed] W. O. Ostheimer, Deputy Clerk.”
From the testimony -of one of the counsel, who appears at that time to have represented the different groups, composed largely, as we infer, of the same individuals who owned the note and who contemplated buying the property, and the testimony of one of the counsel, now representing the appellant, who then represented Payne & Joubert, creditors holding the largest claim, secured by mortgage on the sugar factory which had been conveyed, through L. P. Patout Company, Limited, to Mutual Sugar Company (the latter being one of the corporations organized for the purpose of taking over the property), it appears that the counsel last mentioned was interested, on behalf of his clients, in having canceled all the mortgages, of inferior rank to theirs, including that under which the property had been sold, and that the counsel first mentioned gave, or sent, him the note in question for that purpose, as the recorder required its production. Both counsel testify that the idea was to have the recorder to cancel merely the mortgage, and not the obligation represented by the note; but the counsel who presented the note was unwilling, in giving his testimony, to say that the recorder had not acted in accordance with his instruction, and he admitted that he might have said to him, “Cancel this,” which, we think, would have meant that the recorder should do exactly as he did. And that action would seem also to have been in accordance with Gajan’s expectations, for, being placed on the stand as a witness for L. P. Patout Company, Limited, and asked whether he was the Gajan who had participated in the purchase of the note, he was next asked: “Who owns that note, now?” To which he replied: “The note has been canceled, I suppose.” It is true that in his subsequent examination he testified that the note had been sold to L. P. Patout Company, Limited, and yet we find that on April 17, 1909, six months after the sale of the property, and about five months after the alleged sale of the note, Gajan et al., represented by the counsel who now represent the alleged purchaser, filed an answer to the intervention of the liquidators, in which they alleged that:
“Out of the proceeds of the sale, the sheriff, having deducted his costs and discharged the prior liens, privileges, and mortgages, left, to be applied upon your respondents’ writ, the sum of $17,264, and that these respondents in consequence of the inadequacy of the price realized from the sale of said Yacherie plantation remained ordinary creditors of Patout & Burguieres in the sum of $38,570.”
A year later (April, 1910) L. P. Patout Company, Limited, filed its intervention herein, and alleged:
“That the said Yacherie plantation was sold * * * for * * * $142,000; that the mortgages and privileges ranking that of the seizing creditor, * * * aggregated upwards of $123,-000, leaving your petitioner, by reason of the purchasing of said note, an ordinary creditor of Patout & Burguieres for upwards of $38,-000.”
As it is quite evident that Gajan et al. and L. P. Patout Company, Limited, cannot both be the creditors of Patout & Burguieres for the same $38,000 and upwards, the explanation is offered that their counsel were not informed, until March 24, 1910, that the one client had sold the note to the other. As to one of the counsel, there would seem, how-, ever, to have been rather a failure of mem *1077 ory than lack of original information, since his name appears as a witness upon a notarial act of December 20, 1908, whereby L. P. Patout Company, Limited, granted a second mortgage for $30,000, to secure payment of 50 notes, described in the act, which mortgage the appellant offered testimony to show was granted as the purchase price of the $50,000 note, though, to be sure, neither the $50,000 note nor the makers nor previous holders are therein alluded to, and Gajan, while he mentioned the mortgage in his testimony, did not mention that he had received any of the notes. Conceding, however, that the counsel were not informed, when in April, 1909, they were employed by Gajan et al. to come into court and make the assertion that their clients were then the owners of the $50,000 note, and were therefore entitled to the balance in the hands of the sheriff resulting from the foreclosure thereon, would it not be more reasonable, and certainly more charitable, to conclude, either that Gajan et al. had not then sold the note, or had not sold it as conferring upon the vendee any rights with respect to the fund in the hands of the sheriff, than to adopt the view that they had either forgotten the sale, or, ignoring it, were deliberately attempting to appropriate something with which they had parted, for a valuable consideration? Again, Gajan et al. alleged, in effect, that after deducting all prior claims (including the charges of the sheriff, which, in turn, included the amount here claimed by the liquidators), there had been left, to be applied upon their writ, the sum of $17,264, meaning that they had received that amount from the sheriff and had applied it in part payment of the note to enforce the payment of which the writ had issued; and they further alleged that they still remained the ordinary creditors of the makers of the note in the sum of $38,570. When, a year later, L. P. Pat-out Company, Limited, came into court and alleged that it was the owner of the note and the ordinary creditor of the makers for upwards of $38,000, it did not pretend to have received the $17,264 which had been left to be applied to the payment of the note, nor did it suggest, nor does it now suggest, that that balance was improperly collected by Gajan et al., or that Gajan et al. are its debtor therefore, as for money collected for its account; and yet, if the bargain betweeh them did not contemplate that the purchase of the note should give the company the right to collect the $17,264, neither did it contemplate that such purchase should give it the right to collect the amount here claimed, or any other amount forming part of that realized in the foreclosure proceeding.
Inasmuch, therefore, as the appellant never acquired any interest in the fund which is the subject of this dispute, as the court- a qua has decided that, as between Gajan et al., whose claim might otherwise have been recognized, and the liquidators of the State National Bank, the fund should be paid over to the liquidators, and, as Gajan et al. have not appealed, it is evident that there is no one before the court who has a standing to question the correctness of the judgment appealed from.
We may add that, in view of the stipulation which has been quoted, in the contract whereby Gajan et al. bought the $50,000 note, and of the fact that the note was long past due, even when they acquired it, they could have conveyed to L. P. Patout Company, Limited, only such rights against the party, from whom they acquired as they themselves possessed, and that the rights here asserted by L. P. Patout Company, Limited, were not included in the conveyance.
Judgment affirmed.